J-A02025-23

2023 PA Super 33

| | | |
|---|---|---|
| SUMMER ROGOWSKI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID KIRVEN | : | No. 725 WDA 2022 |

Appeal from the Order Entered May 23, 2022
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD-18-000666

BEFORE:  BOWES, J., OLSON, J., and MURRAY, J.

OPINION BY OLSON, J.:                              **FILED: MARCH 1, 2023**

Appellant, Summer Rogowski, ("Mother") appeals from the May 23, 2022 final custody order entered in the Court of Common Pleas of Allegheny County that, *inter alia*, granted David Kirven ("Father") sole legal custody to make medical decisions related to the COVID-19 vaccination, and any subsequent boosters that become available, for their minor child, O.K., born December 2013 ("the Child").  We affirm, in part, and vacate, in part, the custody order in accordance with this opinion.

The trial court summarized the factual and procedural history as follows:

[Mother and Father] married in 2012, welcomed their first and only child [together] in 2013, and separated in 2018.  Mother worked as a client assistant at the Veterans Leadership Program but is currently a "stay-at-home Mom."  Father [] worked for five and [a] half years as a medical support assistant for the [Veterans Affairs] Hospital.  During the COVID-19 pandemic, his job transitioned to a work-from-home position[,] and Father expects that change to be permanent.

Mother is now married to Jared Rogowski ("Stepfather"), with whom she has two children, [a child] age 18 months and another [child] that was born just after the custody trial [in March 2022]. Mother and her new family live in Canonsburg, [Pennsylvania] in the Canon-McMillan School District. They moved there [] in 2019. Father lives in Mount Lebanon, [Pennsylvania] where he purchased a home in May [] 2018. He previously lived in Dormont, [Pennsylvania] where the Child attended kindergarten [in the Keystone Oaks School District].

After the parties' separation in 2018, they agreed to a week-on/week-off shared custody schedule that continued until August [17,] 2020, when the [trial] court entered a [] custody order following a one-day trial. That order reduced Father's custody to the first, second, and fourth full weekends of each month during the school year. During summer break[,] the parties were to share physical custody [by following a] week-on/week-off [schedule]. The [August 17, 2020 custody] order also granted the parties shared legal custody but awarded Mother sole legal custody for educational decision-making. With this authority, Mother changed the [] school district [in which the Child was enrolled] from Keystone Oaks [School District], where the Child attended kindergarten, to [the] Canon-McMillan [School District], where she [] attended 1st and 2nd grades.

Father filed a petition for modification of custody on March 12, 2021, seeking a return to a week-on/week-off shared physical custody schedule throughout the year[, as well as shared legal custody except that Father would have sole legal custody as to educational decision-making]. The [trial] court conducted a one-day custody trial on March 14, 2022. The following witnesses testified: Father, [Father's] friend[,] and Mother. During the trial, Mother testified to having the Child baptized without notifying Father and contrary to [Father's] known wishes. Mother also stated that she would not discourage the Child from calling Stepfather "dad" or "daddy." [The trial] court found Mother's actions to be part of a pattern of behavior on her part to diminish Father's place and authority in the Child's life.

[In a March 30, 2022 custody order, the trial] court granted Father's petition for modification[,] in part[, by returning the parties to a week-on/week-off physical custody schedule. The trial court denied] Father's request for sole legal custody [concerning educational decision-making.] The [trial] court[, however, removed] Mother's sole legal custody for educational

- 2 -

decision[-]making [and returned the parties to shared legal custody for decisions regarding the Child's "education, non-emergency medical care, dental treatment, psychological and/or psychiatric care, religious upbringing, participation in extra-curricular activities, and other such major decisions and events that could significantly affect the Child's physical, spiritual, educational, and psychological and/or psychiatric well-being."] The [trial] court specified that, when unable to agree on medical issues, the parties shall follow the recommendations of the Child's treating physician. Finally, Mother was held in contempt for baptizing the Child without notifying Father and without Father's consent. [Mother] was given the purge condition of [strictly] complying with a regular course of co-parent counseling for a period of one year. [Both Mother and Father were also ordered to "immediately begin co-parent counseling" and "choose a counselor skilled in family conflict" for the purpose of minimizing "stress on the Child" and to "assist the parents in achieving a functional co-parenting relationship."]

On April 4, 2022, Mother submitted an emergency motion for reconsideration and injunctive relief [challenging] the [trial] court's requirement that the parties follow the recommendations of the Child's treating physician if unable to come to an agreement [regarding the Child's medical treatment.[1]] After argument [on Mother's emergency motion], the [trial] court[, on April 5, 2022,] vacated that provision [of the March 30, 2022 custody order] and scheduled a hearing on the issue of temporary sole legal custody for medical decision-making regarding administration of the [COVID]-19 vaccine and boosters. Before that hearing could take place, Mother filed a second motion for reconsideration asking the [trial] court to purge the finding of contempt and vacate the provisions compelling co-parent counseling and requiring the parties to correct the Child's use of names like "Mom" and "Dad" for the parties' significant others.

_____

[1] Mother's emergency motion for reconsideration and injunctive relief appears to have been submitted to the trial court on April 4, 2022, but was not docketed until April 26, 2022. Father filed an answer to Mother's emergency motion for reconsideration and injunctive relief on April 5, 2022.

Trial Court Opinion, 8/26/22, at 2-4 (record citations, extraneous capitalization, and footnote omitted). The trial court denied Mother's second motion for reconsideration on April 27, 2022.[2]

On May 20, 2022, the trial court conducted a custody hearing on the issue of legal custody for medical decision-making, and in particular regarding the administration of the COVID-19 vaccine and any boosters for the Child.[3]

_____

[2] The trial court order denying Mother's second motion for reconsideration is dated April 26, 2022, and was filed on April 27, 2022. Mother's second motion for reconsideration, however, does not appear on the trial court docket sheet as having been filed with the trial court and a copy is not included in the certified record. Father's answer to Mother's second motion for reconsideration was filed on April 27, 2022.

In the order, dated April 26, 2022, denying Mother's second motion for reconsideration, the trial court states that Mother's second motion for reconsideration was presented to the trial court and that the trial court considered Father's answer to Mother's second motion for reconsideration. Therefore, we may logically presume that Mother presented her second motion for reconsideration to the trial court on, or prior to, April 26, 2022.

[3] While awaiting a hearing on the issue of legal custody pertaining to medical decision-making, and in particular the administration of the COVID-19 vaccine and any boosters for the Child, Mother filed a notice of appeal on April 26, 2022, challenging the trial court's March 30, 2022 custody order. Mother also filed a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) with her notice of appeal. *See* Pa.R.A.P. 1925(a)(2)(i) (stating, in children's fast-track appeals, a Rule 1925(a) statement "shall be filed and served with the notice of appeal").

Mother's appeal was docketed with this Court at 491 WDA 2022. In a May 19, 2022 *per curiam* order, this Court issued a rule to show cause why Mother's appeal should not be quashed on the ground that the March 30, 2022 custody order was not a final, appealable order because the trial court entered an order granting Mother's emergency motion for reconsideration and injunctive relief.

On May 23, 2022, the trial court granted Father "limited sole legal custody to make medical decisions as to whether [the Child] shall receive the [COVID]-19 vaccination and any subsequent boosters of that vaccine" and in so doing

_____

*Per Curiam* Order (491 WDA 2022), 5/19/22. Mother responded to the rule to show cause order on June 2, 2022. On June 9, 2022, this Court quashed Mother's appeal filed at 491 WDA 2022. *Per Curiam* Order (491 WDA 2022), 6/9/22 (stating that, pursuant to Pennsylvania Rule of Appellate Procedure 1701(b)(3)(ii), Mother's April 26, 2022 notice of appeal became inoperative when the trial court granted her emergency motion for reconsideration and injunctive relief); *see also* Pa.R.A.P. 1701(b)(3)(ii) (stating, "[a] timely order granting reconsideration . . . shall render inoperative any [] notice of appeal . . . thereafter filed or docketed with respect to the prior order").

We are cognizant that a custody order that includes "a finding of contempt is final and appealable when a sanction is imposed." *J.M. v. K.W.*, 164 A.3d 1260, 1264 (Pa. Super. 2017) (*en banc*). For reasons discussed more fully *infra*, the trial court's requirement that Mother "strictly comply[] with a regular course of co-parent counseling for a period of one year" to purge her contempt finding did not amount to a contempt sanction imposed on Mother. Custody Order, 3/30/22, at ¶15; *see also* 23 Pa.C.S.A. § 5323(g)(1)(i-v) (detailing a list of permissible sanctions that may be imposed upon finding a party in contempt for noncompliance with a custody order, as discussed more fully *infra*). As such, Mother's April 26, 2022 notice of appeal was rendered inoperative when the trial court granted her emergency motion for reconsideration of the March 30, 2022 custody order.

Ultimately, the March 30, 2022 custody order was made final when the trial court entered its May 23, 2022 order, granting Father limited sole legal custody to make medical decisions regarding the Child's receipt of a COVID-19 vaccination and any subsequent boosters, because the May 23, 2022 order resolved all outstanding issues. *See* Pa.R.A.P. 341(b)(1) (stating, a final order is one that "disposes of all claims and of all parties"). As such, Mother's June 16, 2022 notice of appeal challenged a final and appealable custody order in this matter and, therefore, Mother's appeal is properly before this Court.

denied Mother's emergency motion for reconsideration and injunctive relief. Trial Court Order, 5/23/22. The instant appeal followed.[4]

Mother raises the following issues for our review:

[1.]    Whether the trial court committed an abuse of discretion and an error of law in finding Mother in contempt of court for baptizing the Child?

[2.]    Whether the trial court committed an abuse of discretion and an error of law by entering an order that mandated co-parent[] counseling as the purge condition for Mother's contempt?

[3.]    Whether the trial court committed an abuse of discretion in entering an order restricting the Child to referring only to [her] biological parents as "Dad" or "Mom" or derivatives thereof?

Mother's Brief at 14 (extraneous capitalization omitted).[5]

In her first two issues, Mother challenges the trial court's finding that Mother was in contempt of the August 17, 2020 custody order for having the Child baptized and requiring Mother to strictly comply with a regular course of co-parent counseling for one year to purge the contempt. *Id.* at 38-44. Mother asserts that the trial court erred and abused its discretion in finding her in contempt of the August 17, 2020 custody order because a "court cannot

_____

[4] Mother filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), along with her notice of appeal on June 16, 2022. The trial court filed its Rule 1925(a) opinion on August 26, 2022. On October 13, 2022, Father filed with this Court a letter indicating that he did not intend to file an appellee's brief.

[5] For ease of disposition, we have reordered Mother's issues raised on appeal.

impinge on a parent's right to raise his or her child in a particular religion, unless such conduct is demonstrated to 'present a substantial threat of present or future, physical or emotional harm to the child in absence of the proposed restriction.'" *Id.* at 40, *citing Hicks v. Hicks*, 686 A.2d 1245 (Pa. Super. 2005). Mother argues that the trial court "may only curtail the religious freedoms of either parent to the extent that the beliefs harm the child," and the trial court, in the instant case, did not enter a finding of harm to the Child, either present or potential, as a result of Mother having the Child baptized. Mother's Brief at 42. Mother further contends that the trial court's requirement that she strictly comply with co-parent counseling for one year to purge the contempt finding was improper pursuant to Section 5323(g) of the Child Custody Act, 23 Pa.C.S.A. §§ 5321 - 5340. Mother's Brief at 43, *citing* 23 Pa.C.S.A. § 5323(g).

"In reviewing a trial court's finding on a contempt petition, we are limited to determining whether the trial court committed a clear abuse of discretion. This Court must place great reliance on the sound discretion of the trial [court] when reviewing an order of contempt." *P.H.D. v. R.R.D.*, 56 A.3d 702, 706 (Pa. Super. 2012), *appeal denied*, 94 A.3d 1010 (Pa. 2014).

> "To be in contempt, a party must have violated a court order, and the complaining party must satisfy that burden by a preponderance of the evidence. Specifically, the complainant must prove certain distinct elements: (1) that the contemnor had notice of the specific order or decree which he[, or she,] is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent.

***J.M.***, 164 A.3d at 1264 (citations, quotation marks, and original brackets omitted).

In the instant case, pursuant to the August 17, 2020 custody order, Mother and Father shared legal custody as follows:

1. Legal Custody:

   a.  Except as provided in Paragraph 1(b) below, the parties shall exercise shared legal custody of the [Child], as defined by 23 Pa.C.S.[A.] § 5322. Each party shall have access to any and all records involving the [Child], including, but not limited to, medical, educational, and religious records of the [Child]. Each party shall be entitled to any and all information affecting the health and welfare of the [Child], and neither party shall withhold this information from the other parent. Day[-]to[-]day decisions shall be made by the parent that has physical custody of the [Child].

   b.  Sole legal custody for educational decision-making is hereby granted to Mother, who is authorized to enroll the [Child] in the public school and the academic program of [Mother's] choice.

Custody Order, 8/17/20, at ¶1 (extraneous capitalization omitted).

Section 5322 of the Child Custody Act defines "legal custody" as "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious[,] and educational decisions." 23 Pa.C.S.A. § 5322. "Shared legal custody" is defined as "[t]he right of more than one individual to legal custody of the child." ***Id.*** When parents share legal custody, the parents are strongly encouraged to reach a consensus on decisions that affect a child's life, including medical, educational, and religious decisions. Courts

have long-recognized, however, that when the parents reach an impasse in making decisions for a child that implicates custody, the parties must turn to the trial court to decide their impasse. *S.W.D. v. S.A.R.*, 96 A.3d 396, 404 (Pa. Super. 2014). "[T]he concept of shared legal custody does not contain the principle of giving one parent final authority in the event of a dispute." *B.S.G. v. D.M.C.*, 255 A.3d 528, 534 (Pa. Super. 2021) (citation and original quotation marks omitted).

In finding Mother in contempt of the August 17, 2020 custody order, the trial court held that, "[a]t trial, Mother offered an illogical and self-serving interpretation of 'shared legal custody' that cries out for correction *via* a finding of contempt." Trial Court Opinion, 8/26/22, at 8; *see also* Trial Court Findings, Conclusions, and Order, 3/30/22, at 9 (stating, "Mother's interpretation of '[s]hared [l]egal [c]ustody' is illogical and one-sided"). The trial court recognized that the decision to baptize a child

> is a major decision that extends beyond mere religious practice. Baptism entails a commitment to a particular denomination that cannot be easily undone or supplanted. This is particularly true of Catholic baptism - the Catechism of the Catholic Church repeatedly describes baptism as "an indelible spiritual mark" that cannot be erased or repeated.

*Id.* at 6-7. The trial court further held that,

> [a]s such, Mother's baptism of the Child into the Catholic Church against the wishes of Father creates a shared religious experience between Mother and the Child at Father's exclusion. Furthermore, the baptism involved Mother selecting her new husband's parents as the Child's godparents without Father's input. Mother unilaterally made each of these major decisions and in doing so

- 9 -

deprived Father of his shared right [to participate in the formulation and finalization of] those decision[s] for the Child.

*Id.* at 7. The trial court found that Mother was "fully aware that Father was in direct disagreement with the baptism" and that "Mother clearly had concerns about the legality of her decision [to have the Child baptized] because she consulted her attorney" before having the Child baptized. *Id.* at 6. The trial court explained that, "[b]y making this decision on behalf of the Child, Mother denied Father his right as legal custodian of the Child to decide on the matter and in doing so she knowingly violated the [trial court's] August 1[7], 2020 [custody o]rder[.]" *Id.*

> At the outset, we are cognizant that,
>
> each parent must be free to provide religious exposure and instruction, as that parent sees fit, during any and all periods of legal custody or visitation without restrictions, unless the challenged beliefs or conduct of the parent are demonstrated to present a substantial threat of present or future, physical or emotional harm to the child in absence of [a] restriction.

*Hicks*, 868 A.2d at 1249, *relying on Fatemi v. Fatemi*, 489 A.2d 798 (Pa. Super. 1985). The trial court's finding that Mother was in contempt of the August 17, 2020 custody order, which granted Mother and Father shared legal custody over decisions involving, *inter alia*, religious matters, was not a restriction on Mother's decision to expose the Child to the Catholic faith through baptism. Rather, the finding of contempt was based upon Mother's unilateral decision to baptize the Child, despite knowing Father's opposition to the concept of baptism, in violation of the August 17, 2020 custody order and

- 10 -

without first seeking the trial court's intervention as an arbitrator of the impasse that emerged between Mother and Father over the issue of baptism. Simply put, the contempt finding was based not on what Mother did, but how she went about doing it.

By its very definition, shared legal custody is the right of more than one individual with legal custody to a child to make major decisions jointly on behalf of the child, including religious decisions. Mother, when questioned by the trial court at the March 2022 custody hearing, explained that, although she "wouldn't like for it to be that way," when Father would not agree with Mother about a major decision concerning the Child, Mother would just make her own decision and not tell Father about it. N.T., 3/14/22, at 328. Mother further agreed that even if a decision involved more than the Child's day-to-day activities, Mother made the decision without Father, and did not communicate the decision to Father, if the decision were made during Mother's custody time. *Id.* at 324-325.

It is evident, based upon the record, that Mother was aware of the August 17, 2020 custody order that granted her and Father shared legal custody to the Child. The sole exception to the shared custody arrangement was that Mother enjoyed sole legal custody for educational decision-making. Indeed, after the trial court entered that custody order, Mother enrolled the Child in the school district associated with Mother's residence. *Id.* at 200. Mother acknowledged that the issue of baptism was discussed as part of the August 2020 custody hearing, and Mother understood that Father was

opposed to the Child being baptized. *Id.* at 281-282, 329. Mother admitted that she had the Child baptized without consulting Father after the August 17, 2020 custody order was entered, despite knowing that she and Father shared legal custody concerning major religious decisions. *Id.* at 281-282, 326-329, 329. As such, Mother knew that she and Father were at an impasse regarding the decision of whether, or not, to baptize the Child. Rather than bring this issue before the trial court, Mother chose to have the Child baptized without consulting Father and without notifying Father of her decision until a month after the baptism occurred. *Id.* at 322, 326-327 (acknowledging that, when there was no cohesion between Mother and Father and Father was not in agreement with Mother's proposed decision, Mother went forward with her decision unilaterally). It is inherent within the concept of shared legal custody that a parent is required to seek the trial court's intervention when an impasse emerges, and that the emergence of an impasse does not give one parent the authority to make a decision unilaterally. *B.S.G.*, 255 A.3d at 534. Because Mother did not seek the trial court's intervention upon reaching an impasse with Father regarding the question of whether, or not, to baptize the Child and, instead, went forward with the Child's baptism, Mother failed to adhere to the trial court's August 17, 2020 custody order granting both parents shared legal custody over such matters. Therefore, we discern no error of law or abuse of discretion in the trial court finding Mother in contempt of the August 17, 2020 custody order.

Upon finding Mother in contempt, the trial court ordered Mother to "strictly comply[] with a regular course of co-parent counseling for a period of one year" to purge her contempt. Custody Order, 3/30/22, at ¶15. Section 5323(g) of the Child Custody Act states that when a party in a custody matter has been adjudged in contempt of a custody order, the contempt may be punishable by any one of the following sanctions:

(i) Imprisonment for a period of not more than six months.

(ii) A fine of not more than $500[.00].

(iii) Probation for a period of not more than six months.

(iv) An order for nonrenewal, suspension[,] or denial of operating privilege under [23 Pa.C.S.A. § 4355] (relating to denial or suspension of licenses).

(v) Counsel fees and costs.

23 Pa.C.S.A. § 5323(g)(i-v).

We concur with the trial court that, pursuant Section 5333 of the Child Custody Act, a trial court "may, as part of a custody order, require the parties to attend counseling sessions." 23 Pa.C.S.A. § 5333(a). Attendance at counseling sessions, however, is not an enumerated sanction under Section 5323(g) that may be imposed as punishment for an act of contempt in a custody matter. 23 Pa.C.S.A. § 5323(g)(i-v). Therefore, we find the trial court erred in imposing this requirement on Mother as a condition to purge her contempt. Consequently, we vacate this portion of the March 30, 2022

custody order.[6]  Upon remand, the trial court may choose to impose a sanction on Mother for her contempt of the August 17, 2020 custody order but any sanction must comply with Section 5323(g).

In her final issue, Mother challenges a portion of the March 30, 2022 custody order that restricted the Child's use of the terms "Dad" or "Mom," or derivatives thereof, as applying only to the biological parents in violation of the Child's First Amendment right to freedom of speech.  Mother's Brief at 28-38.

> Our standard and scope of review of a custody order is well-established.

> Our standard of review over a custody order is for a gross abuse of discretion.  Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias[,] or ill[-]will as shown by the evidence of record.

**A.L.B. v. M.D.L.**, 239 A.3d 142, 147 (Pa. Super. 2020) (quotation marks omitted), citing **Yates v. Yates**, 963 A.2d 535 (Pa. Super. 2008).  In reviewing a custody order,

> [w]e must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations.  In addition, with regard to issues of credibility and weight of the evidence, we must defer to the [trial court] who viewed and assessed the witnesses

---

[6] Our decision herein does not invalidate the trial court's requirement that both Mother and Father immediately engage in co-parent counseling, as detailed in paragraph 16 of the March 30, 2022 custody order.  As discussed *supra*, Section 5333 of the Child Custody Act permits the trial court to require the parents to attend counseling as part of the custody order.

first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*A.L.B.*, 239 A.3d at 147-148. As with all custody matters, "the paramount concern is the best interest of the [child] involved." *Id.* at 148.

[I]n cases raising First Amendment issues[, however,] an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.

*S.B. v. S.S.*, 243 A.3d 90, 104 (Pa. 2020) (citation and quotation marks omitted), *cert. denied*, 142 S.Ct. 313 (2021).

As our Supreme Court in *S.B.*, *supra*, reiterated,

It is beyond cavil that our political and cultural lives rest upon the principle, guaranteed by the First Amendment, that each person should decide for him[self] or herself the ideas and beliefs deserving of expression, consideration, and adherence. Accordingly, the First Amendment precludes the government from restricting expression due to its message, ideas, subject matter, or content. One's constitutional right to free speech, however, while fundamental, is not absolute.

*S.B.*, 243 A.3d at 104 (citations and quotation marks omitted).

[C]ontent-based restrictions on speech are presumptively unconstitutional and are subject to the strict scrutiny standard, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest. Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed.

*Id.* at 104-105 (citations and quotation marks omitted). Stated differently, "[a] restriction is content[-]based if either the face of the regulation or the purpose of the regulation is based upon the message the speaker is conveying." *Id.* at 105.

It is well-established that Pennsylvania "has an interest in protecting the physical and mental health of [a] child." *Shepp v. Shepp*, 906 A.2d 1165, 1173 (Pa. 2006) (citation and original quotation marks omitted), *cert. denied*, 550 U.S. 908 (2007). "[A] state's compelling interest to protect a child in any given case, however, is not triggered unless a court finds that [the] speech [to which a restriction is addressed caused] or will cause harm to a child's welfare." *Shepp*, 906 A.2d at 1173.

Here, the trial court, *vis-à-vis* the March 30, 2022 custody order, placed the following restriction on the Child's speech:

> The parties shall not encourage the Child to refer to anyone other than the parties as Mother, Mom, Father, Dad, [*et cetera*.] In the event the Child refers to a party's spouse or significant other in such a way, that party shall correct the Child.

Custody Order, 3/30/22, at ¶23. In so ordering, the trial court restricted the Child's use of the terms "Mom," "Dad," or a derivative thereof, as applying to only the Child's biological parents. As such, we find this restriction to be a content-based restriction because the purpose of the restriction was to limit the message that the Child conveyed through use of the terms "Mom" or "Dad" to denote a biological, familial relationship with the person rather than a

non-biological, familial relationship as exists in the case of a step-parent. Therefore, this restriction is subject to the strict scrutiny standard.

The trial court discussed the need to impose a restriction on the Child's speech within the context of its "best interest of the child" analysis as follows:[7]

> Father testified that the Child is calling Stepfather "Dad" or "Daddy," a term that applied only to Father during the Child's first five years of life - years during which Father testified he was the Child's "stay-at-home Dad."
>
> Mother testified that it is "unreasonable" to expect the Child, at age 8, to call Stepfather by a name different from [w]hat her two younger half-siblings will use in the future. She said that [the Child's half-brother], at 18 months, is "just getting the hang" of saying "Da" with reference to Stepfather. Mother said she introduced [Stepfather] to the Child in May 2018, and that she has never told the Child to call him "Dad" or ["]Daddy." [Mother] is disinclined to have the Child call Stepfather by some other name as she hopes in the future the three children will refer to him uniformly.
>
> Mother's desire that the Child refer to someone other than Father as "Dad" or "Daddy" is concerning. It is unreasonable for Mother to expect that Father share the title "Dad" with Stepfather, particularly in light of evidence that Mother has acted in ways to diminish Father's role in the Child's life, such as leaving him in the dark regarding a baptism and chiropractic appointments.

_____

[7] In particular, the trial court discussed the need for such a restriction within the context of the factor for consideration in determining the best interest of a child set forth at Section 5328(a)(8) of the Child Custody Act as follows:

> The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

23 Pa.C.S.A. § 5328(a)(8); **see also** Trial Court Findings, Conclusions, and Order, 3/30/22, at 6-7.

Mother testified that Father has failed to support Stepfather's role. Until recently, she said Father referred to Stepfather as "the other man" or Mother's "significant other."

Several months ago, Father decided to take the Child to the emergency room due to symptoms including swelling of the hands and feet. The parents discussed the situation when the Child came into Father's custody. Before Father notified Mother of his decision to go to the [emergency room], Mother received an audio message from the Child stating[,] "Please don't tell Dad that I told you. I have to go to the hospital." There is a conspiratorial and anxious tone in the Child's voice.

The [trial] court is concerned that the parents' ill[-]will and lack of trust is cultivating unhealthy bonds between each parent and the Child. Such bonds may result when Child keeps secrets and withholds information from the other parent.

Trial Court Findings, Conclusions, and Order, 3/30/22, at 6-7 (extraneous capitalization omitted).

The trial court, in imposing a restriction on the Child's speech, did so in an attempt to further Pennsylvania's interest in protecting the Child's mental and psychological well-being by maintaining and strengthening the strained relationship between Child and Father. We cannot, however, agree that the restrictions the trial court placed on the Child's use of the terms "Mom," "Dad," of a derivative thereof, were narrowly tailored to further Pennsylvania's compelling interest absent a finding by the trial court that the use of the term "Dad" or "Daddy" to refer to Stepfather caused harm or will cause harm to the Child. Indeed, the text of the trial court's order suggests that the trial court was concerned that the parents' mutual ill-will and mistrust may have cultivated unhealthy bonds between the parents and the Child, not that the terms the Child used to refer to her parents and stepparents were central to

that process. Without a finding that the Child's use of the terms "Dad" and "Daddy" to refer to Stepfather posed a tangible risk of harm to the Child, we are constrained to vacate the content-based restriction imposed by the trial court.

We do not suggest that the Child's relationship with Father is not an important, and vital part of, the Child's development and well-being, just as the Child's relationship with Stepfather is also important and vital to the Child's development and well-being. As noted by the trial court, however, "[t]he relationship between the Child and Father has been strained over the past few years as Father worked to address the [trial court's] concerns." Trial Court Opinion, 8/26/22, at 12. Importantly, we concur with the trial court, and the record supports, that "**the parents' ill[-]will and lack of trust is cultivating unhealthy bonds between each parent and the Child**." Trial Court Findings, Conclusions, and Order, 3/30/22, at 7. Without a causal link between the expression at issue and a risk of harm to the Child, we are inclined to follow the teachings of our prior decisions. The principal set forth by this Court in **Fatemi**, **supra**, is as meaningful today as it was then - a parent-child relationship should be defined by, and developed according to, the personalities and character of a child and each parent, unhampered, to the extent possible, by restrictions imposed by the court. **Fatemi**, 489 A.2d at 802. In other words, how, and by what term, a child refers to a significant person in his or her life should be set by the personalities and characters of the child and that person, and the term should not be used as a weapon by

others to deter the child's relationship with that person. As such, we vacate that portion of the March 30, 2022 custody order, specifically paragraph 23 of the custody order, concerning the Child's use of the terms "Mom" and "Dad," or derivatives thereof, when referring to person's other than the biological parents.

Order affirmed, in part. Order vacated, in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/1/2023